**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Civil Division**

| | |
|---|---|
| **DOTYLN JOGRAJ** | : |
| **1125 Port Echo Lane** | |
| **Bowie, MD 20716** | : |
| | |
|     *Plaintiff,* | : |
| | |
| **v.** | : |
| | |
| **HP ENTERPRISE SERVICES, LLC** | : |
| **5400 Legacy Drive** | |
| **H4-1H-13** | : |
| **Plano, TX 75024** | |
| | : |
| **SERVE:**   **CT Corporation System** |   **Civil Action No.** |
|            **1015 15th Street, N.W.** | : |
|            **Suite 1000** | |
|            **Washington, D.C.  20005** | : |
| | |
| **and** | : |
| | |
| **THE EXPERTS, INC.** | : |
| **401 East Las Olas Blvd.** | |
| **Suite 1400** | : |
| **Fort Lauderdale, FL  33301** | |
| | : |
| **SERVE:**   **THOMAS HOSHKO** | |
|            **CEO** | : |
|            **401 East Las Olas Blvd.** | |
|            **Suite 1400** | : |
|            **Fort Lauderdale, FL  33301** | |
| | : |
| **and** | |
| | : |
| **HBC MANAGEMENT SERVICES, INC.** | |
| **485 Devon Park Drive** | : |
| **Suite 109** | |
| **Wayne, PA  19087** | : |

| | | |
|---|---|---|
| **SERVE:** | **CT Corporation System** | : |
| | **1015 15th Street, N.W.** | |
| | **Suite 1000** | : |
| | **Washington, D.C.  20005** | |
| | | : |
| **and** | | |
| | | : |
| **THE HANA GROUP, INC.** | | |
| **485 Devon Park Drive** | | : |
| **Suite 109** | | |
| **Wayne, PA  19087** | | : |
| | | |
| **SERVE:** | **CT Corporation System** | : |
| | **1015 15th Street, N.W.** | |
| | **Suite 1000** | : |
| | **Washington, D.C.  20005** | |
| | | : |

*Defendants.*

## COMPLAINT

Plaintiff Dotlyn Jograj brings this claim against Defendants HP Enterprise Services, LLC, The Experts, Inc., HBC Management Services, Inc., and The Hana Group, Inc. (collectively "Defendants"), and in support thereof states the following:

## PARTIES

1.      Plaintiff Dotlyn Jograj is an adult resident of the State of Maryland.

2.      HP Enterprise Services, LLC (hereinafter "HPES")  is a limited liability company organized under the laws of Delaware, with its principal place of business in Texas.  At all times relevant to this action, HPES, through its agents and employees, employed individuals to work under a contract at the Washington Navy Yard, and as such availed itself of the jurisdiction of the courts of the District of Columbia.

3.      The Experts, Inc. (hereinafter "The Experts") is a corporation organized under the laws of Florida, with its principal place of business in Florida.  At all times relevant to this

action, The Experts, through its agents and employees, employed individuals, including but not limited to Aaron Alexis, to work under a contract at the Washington Navy Yard, and as such availed itself of the jurisdiction of the courts of the District of Columbia.

4.      HBC Management Services, Inc. (hereinafter "HBC") is a corporation organized under the laws of Hawaii, with its principal place of business in Pennsylvania.  At all times relevant to this claim, HBC, through its agents and employees, employed individuals to provide security to Building 197 at the Washington Navy Yard, and as such availed itself of the jurisdiction of the courts of the District of Columbia.

5.      The Hana Group, Inc. (hereinafter "The Hana Group") is a corporation organized under the laws of Hawaii, with its principal place of business in Pennsylvania.  At all times relevant to this claim, The Hana Group, through its agents and employees, employed individuals to provide security to Building 197 at the Washington Navy Yard, as such availed itself of the jurisdiction of the courts of the District of Columbia.

## JURISDICTION AND VENUE

6.      Jurisdiction in this matter is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).  The matter in controversy in this matter exceeds the sum of $75,000 exclusive of interest and costs, and this matter is between citizens of different states.  Plaintiff is a resident of Maryland, and Defendants are deemed citizens of Florida (The Experts), Delaware and/or Texas (HPES), and Hawaii and/or Pennsylvania (HBC/The Hana Group).

7.      Venue in this action properly lies in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the events or omissions giving rise to this claim occurred in the District.  Specifically, the shooting at

the center of this matter occurred within the District at the Washington Navy Yard located in Washington, D.C.

## INTRODUCTION

8.    The Washington Navy Yard is a military installation located in Southeast Washington, D.C.  It is an administrative and ordnance center for the U.S. Navy.  Like many other military installations throughout the United States, including but not limited to the Joint Base San Antonio-Fort Sam in Houston, TX, Fort Knox, KY, Quantico, VA, the Joint Base Elmendor-Richardson, AK, Fort Bragg, NC, Fort Carson, CO, Fort Campbell, KY, Fort Drum, NY, and the Naval Air Systems Command in Arlington, VA, the Washington Navy Yard is subject to a heightened risk of violent attacks, and in particular gun violence.  Each of these military installations suffered a violent attack on at least one occasion during the 17 years prior to the September 16, 2013, shooting that is the subject this lawsuit, and the Washington Navy Yard itself had been attacked previously on two separate occasions in 1983 and 1984.

9.    It has been widely recognized since at least 1995, following the Oklahoma City bombings, that federal facilities carry a heightened risk of violence.  (See U.S. Dept. of Justice, *Vulnerability Assessment of Federal Facilities* (June 28, 1995), https://www.ncjrs.gov/pdffiles1/Digitization/156412NCJRS.pdf).

10.    At all times relevant herein, Aaron Alexis was employed by The Experts as a technician and on the date of the attack was working at the Washington Navy Yard.

11.    At all times relevant herein, The Experts and HPES provided access to the Washington Navy Yard by obtaining common access cards or building passes for their employees, agents, and subcontractors.

12.     At all times relevant herein, physical security at the Washington Navy Yard was limited and was dependent upon presumed proper screening, selection, and supervision by the contractors working there of their employees, agents, and subcontractors.

13.     On September 16, 2013, Ms. Jograj was employed by TWD & Associates.  On that day she reported to her place of work located on the fourth floor of Building 197 at the Washington Navy Yard in Washington, DC.

14.     At approximately 8:15 AM on this date, Aaron Alexis, armed with a sawed-off shotgun, entered the fourth floor of Building 197 where Ms. Jograj was working.  Mr. Alexis began firing his weapon toward Ms. Jograj and others.  During this shooting spree, Mr. Alexis killed twelve people in total and injured several others before he was shot and killed by police.  Ms. Jograj heard many gunshots and was an eyewitness to the murder of victim John Roger Johnson.  She saw Mr. Alexis pointing his gun, and fearing for her life, she hid under her desk.  In doing so, she sustained an injury to her left knee.  Additionally, she witnessed blood splattered on the walls of Building 197.  As a result, Ms. Jograj sustained serious physical and psychological injuries.

15.     On the date of the incident, Mr. Alexis was employed by The Experts, which had been contracted by HPES to perform information and technology services under the Navy-Marine Corps Intranet Continuity of Service Contract ("the Contract") at the Washington Navy Yard.

16.     Upon information and belief, Mr. Alexis gained access to the Navy Yard facility and Building 197 with a valid Common Access Card ("CAC") and a temporary building badge.

17.     On the date of the incident, Mr. Alexis drove onto the Navy Yard facility in a rented blue Toyota Prius with New York license plates.  He parked in a parking garage in Building 28.

18.     He entered Building 197 using either a valid temporary access badge or CAC to pass through the electronic badge reader.  He also passed a guard station.

19.     Upon information and belief, when he entered Building 197, Mr. Alexis was carrying a backpack, a concealed shotgun, and ammunition.  HBC and/or The Hana Group did not require Mr. Alexis to pass through a metal detector, to undergo any type of screening, nor were his items or his person searched or scanned by employees or agents of HBC and/or The Hana Group.

20.     After the shooting, the Department of Defense and Department of the Navy conducted an investigation into the causes and circumstances of the events that took place on September 16, 2013.  The Department of the Navy concluded that The Experts and HPES failed to meet their contractually-required responsibility and responsibility under the National Industrial Security Program Operating Manual (NISPOM) and the Personnel Security Policy (PSP) to continuously evaluate Mr. Alexis and to report adverse information to the Department of Defense Central Adjudication Facility and U.S. Navy installation commanders, even when they were concerned that Mr. Alexis may cause harm to others.[1]

---

[1] The Department of Navy published a report dated Nov. 8, 2013 title "Report of the Investigation into the Fatal Shooting incident at the Washington Navy Yard on September 16, 2013 and Associated Security, Personnel, and Contracting Policies and Procedures" detailing its findings and conclusions.  The report can be accessed at http://archive.defense.gov/news/newsarticle.aspx?id=121864.

21.     Following the events of September 16, 2013, HPES terminated its contractual relationship with The Experts on the basis that The Experts had breached its contract with HPES by failing to adequately investigate and respond to Mr. Alexis's mental health issues.

### KNOWN HISTORY OF AARON ALEXIS

22.     In 2004, Mr. Alexis was arrested in Seattle, Washington, and charged with malicious mischief, a felony offense.  Mr. Alexis had shot out the rear tires of a construction worker's vehicle after watching him for a period of days.  Mr. Alexis described this event to police as a blackout fueled by anger.  This incident was documented, was public information, and a report of it was available upon request.

23.     In 2006, Mr. Alexis was investigated for an incident where the tires of five vehicles at Mr. Alexis's apartment complex were slashed.  The vehicles belonged to residents or guests living above, below, or adjacent to Mr. Alexis, each of whom were involved in previous complaints made by Mr. Alexis to police.

24.     In 2007, the Office of Personnel Management initiated a records check on Mr. Alexis.  This records check revealed that in 2004 Mr. Alexis had been arrested for malicious mischief in Seattle.

25.     In response to the Office of Personnel Management's uncovering of the 2004 arrest, the Naval Recruiting District obtained a written account of the matter from Mr. Alexis and conducted a corresponding court documents check on the arrest.

26.     In August 2008, Mr. Alexis was arrested for disorderly conduct in DeKalb County, Georgia, when he was removed from a nightclub for causing damage to furnishings. Outside, he proceeded to scream profanities and act uncontrollably and in a hostile manner.

27.     In 2009, Mr. Alexis was again arrested in Fort Worth, Texas, after he leapt from a staircase while intoxicated and fractured his right ankle.

28.     In September 2010, Mr. Alexis was arrested for a third time in Fort Worth, Texas, for discharging a firearm in a municipality.  Upon information and belief, Mr. Alexis was discharging his firearm as a threatening gesture to others in and around his apartment complex.

29.     Despite the fact that these arrests are public information, neither HPES nor The Experts attempted at any time before or during Mr. Alexis's employment to obtain copies of the police reports.

30.     In September 2012, Mr. Alexis applied for employment as a technician with The Experts.  Mr. Alexis's security clearance was still valid because he had not been separated from the Navy for more than twenty-four months prior to his hiring.

31.     In September 2012, The Experts performed a background check on Mr. Alexis in order to determine his eligibility for hire.  Despite the numerous arrests in his background that were a matter of public record, Mr. Alexis was hired by The Experts following this background check.

### EVENTS OF AUGUST 2013

32.     On August 4, 2013, The Experts placed Mr. Alexis on an assignment at the Naval Undersea Warfare Center, a military installation in Newport, Rhode Island.  At this time, Mr. Alexis was working under the Contract with both The Experts personnel and supervisors as well as personnel and supervisors of HPES.

33.     While en route to Newport, Rhode Island, Mr. Alexis placed a call to The Experts' project coordinator to say that a man seated across the aisle from him at the Newport airport was making fun of him.  Mr. Alexis reported becoming angry at the individual.

8

34.     The project coordinator calmed Mr. Alexis down and persuaded him to get away from the individual and seek help from airport security.  The project coordinator reported this call to the Contract team leader for The Experts.

35.     On August 5, 2013, while on the Newport assignment, Mr. Alexis contacted The Experts' travel coordinator to obtain assistance in moving from the Residence Inn in Middletown, Rhode Island, due to noise in the hotel.

36.     On August 6, 2013, Mr. Alexis reported to The Experts' travel coordinator that he believed two men and one woman had followed him from the Residence Inn to the Navy Gateway Inns & Suites, and that these people were talking about him through the walls of an adjacent room and were using a machine to keep him awake.  He reported to her that the machine was allegedly an ultrasonic device that was physically pinning him to the bed.  He made the same report to The Experts' program manager for the Contract.

37.     On August 6, 2013, after speaking with Mr. Alexis, the travel coordinator for The Experts, Inc. called the Navy Gateway Inns & Suites front desk and stated that Mr. Alexis had told her that three people followed him from The Residence Inn and that they kept yelling at him and following him.  The Navy Gateway Inns & Suites desk log indicated that the travel coordinator was very worried that Mr. Alexis might harm others.

38.     After placing this call, The Experts' travel coordinator called The Experts' program manager for the Contract to report the information relayed to her by Mr. Alexis.

39.     Later on August 6, 2013, the Naval Station Newport Police Department received four calls, some from Mr. Alexis and some about Mr. Alexis from other individuals at the Navy Gateway Inns & Suites.  The calls involved noise complaints from Mr. Alexis and his neighboring guests at the Navy Gateway Inn & Suites.

40.     In one of these calls, the front desk clerk for the Navy Gateway Inns & Suites requested that the Naval Station Newport Police keep an officer close to the hotel in case Mr. Alexis attempted to hurt someone.  Upon information and belief, this request was based on the call made by The Experts' travel coordinator to the hotel, in which she said that Mr. Alexis might pose a threat to others.

41.     When officers responded to the calls from the Navy Gateway Inns & Suites on August 6, 2013, they discovered that Mr. Alexis had dismantled his bed because he believed someone was hiding underneath it.  They also observed that Mr. Alexis had taped a microphone to the ceiling to record the voices of people he claimed were following him and talking about him.  Mr. Alexis also told officers about a chip that he believed had been implanted in his head and microwave signals that were allegedly being used to restrict his movement and keep him awake.

42.     On August 7, 2013, Mr. Alexis called a HPES second shift supervisor and requested that he be allowed to stay in her room at the Marriott in Newport because he believed that people had followed him from the Residence Inn to the Navy Gateway Inns & Suites.

43.     When Mr. Alexis arrived at the Marriott, he told the HPES supervisor that three people who had traveled on a plane with him from Norfolk had checked into the same hotel that he had previously checked in to, and had made noises and threats against him.  He also asked her if she could hear the voices he was hearing.  Upon information and belief, she stated that she could not hear the voices.

44.     In the early morning hours of August 7, 2013, the City of Newport Police Department responded to a call from Mr. Alexis that he was being followed.  Mr. Alexis reported that after a verbal altercation with an unknown individual at the Norfolk Airport, this individual

sent three people to follow him and keep him awake.  He reported first hearing them through the wall at the Residence Inn.  Mr. Alexis informed police that these three individuals were now speaking to him through the walls, floor, and ceiling of the Marriott.  He further reported that these individuals were using a microwave machine to send vibrations through the ceiling to prevent him from sleeping.  Upon information and belief, this was Mr. Alexis's second or third call to police that same night.

45.     On August 7, 2013, the Newport Police Officer-in-Charge contacted the Naval Station Police Sergeant and advised her of Mr. Alexis's claims.  The City of Newport Police Department faxed a copy of the incident report to the Naval Station Newport Security Office with a note that read, **"FYI on this.  Just thought to pass it on to you in the event this person escalates.**"

46.     On the morning of August 7, 2013, the HPES second shift supervisor reported Mr. Alexis's behavior to the lead HPES supervisor.  The HPES lead supervisor informed her that The Experts had already issued an email stating that Mr. Alexis would be removed from the Newport project team.

47.     On August 7, 2013, Mr. Alexis continued to make complaints to the HPES second shift supervisor concerning the people who he believed were following him.  He told her he wanted to acquire a radar gun to hear what they were saying.

48.     Later on August 7, 2013, the HPES second shift supervisor again informed the HPES lead supervisor of her discussions with Mr. Alexis.  She also informed a co-worker of their conversations.  No reports, however, were made to HPES security officials or off-site management.

49.     On August 7, 2013, The Experts' human resources director engaged legal counsel and initiated an investigation into the information provided about Mr. Alexis from the night before.  This investigation involved speaking with the HPES second shift supervisor as well as contacting the Middletown, Rhode Island, Police Department, to obtain reports.  However, no reports were obtained because The Experts' human resources director contacted the wrong police department.

50.     On August 7, 2013, The Experts removed Mr. Alexis from his assignment at the Naval Undersea Warfare Center because they believed that he was not mentally stable and posed a danger to others working in and around his workplace.  Upon information and belief, The Experts' Facility Security Officer entered a "Debrief" action that same day in the Joint Personnel Adjudication System (JPAS) in order to prevent Mr. Alexis from accessing the Naval Undersea Warfare Center both physically and electronically.  Upon further information and belief, this debrief entry merely recorded an administrative decision that Mr. Alexis no longer required access to classified information.  This debrief did not constitute a report of adverse information to the Department of Defense Central Adjudication Facility.

51.     On August 9, 2013, The Experts' human resources director contacted Mr. Alexis's mother.  Upon information and belief, Mr. Alexis's mother reported that her son had been suffering from paranoia for a long time, that this was not the first episode he had experienced, and that he required mental health treatment.

52.     Neither HPES nor The Experts reported the incidents of August 4-7, 2013, to the Department of Defense Central Adjudication Facility as they were required to do under their contracts with one another and Department of the Navy and United States government statutes, regulations, guidelines, policies, rules, procedures, directives, and instructions.  These include

but are not limited to the National Industrial Safety Program, NISPOM, the Department of

Defense and Department of Navy PSP, the Department of Defense Security Engineering

Facilities Planning Manual, Executive Order 13467 (June 30, 2008), and Executive Order 12968

(Aug. 2, 1995).

53.    Neither HPES nor The Experts required Mr. Alexis to submit proof of any

counseling or mental health treatment of any kind before allowing him to return to work after the

events of August 4-7, 2013.

54.    HPES and The Experts, through their agents and employees, had actual

knowledge of the events of August 4-7, 2013, and knowledge that Mr. Alexis was likely to cause

bodily harm to people at or near his workplace.

55.    On August 9, 2013, just two days after the conclusion of the incidents in Newport,

The Experts returned Mr. Alexis to work status, which reinstated his physical access to his

various worksites at military installations, including the Washington Navy Yard, as well as his

access to classified information.

**EVENTS OF SEPTEMBER 2013**

56.    On September 9, 2013, The Experts assigned Mr. Alexis to work at the

Washington Navy Yard, a military installation.

57.    Upon information and belief, HPES and The Experts provided Mr. Alexis access

to the Navy Yard facility and Building 197, on the basis of his "SECRET" security clearance,

and did not perform any additional background checks or fitness for duty checks or

examinations, and did not require Mr. Alexis to submit any documentation of mental health

treatment as a result of the August 4-7 incidents.

58.     On September 14, 2013, Mr. Alexis purchased a Remington-870, 12-gauge shotgun in Lorton, Virginia.

59.     On September 16, 2013, at approximately 7:44 AM, Mr. Alexis entered the Washington Navy Yard at the 6th Street gate in a rented blue Toyota Prius with New York license plates.  He used his valid CAC for entry to the Navy Yard facility.

60.     At approximately 7:46 AM, Mr. Alexis entered the parking garage at Building 28 in the Navy Yard facility, located directly across from Building 197.

61.     At approximately 8:00 AM, upon information and belief, Mr. Alexis entered Building 197 through the main entrance.   After entering, he then touched his temporary building badge and/or CAC to the electronic reader while carrying a backpack, a concealed shotgun, and ammunition.  He passed by a HBC and/or The Hana Group guard station in the lobby where he used his temporary building badge.  He did not pass through any metal detectors, nor were his belongings or his person searched by employees or agents of HBC and/or The Hana Group.

62.     At approximately 8:15 AM, Mr. Alexis began firing his weapon at people on the fourth floor of Building 197, including but not limited to Ms. Jograj.  Ms. Jograj sustained serious and permanent physical and/or psychological injuries.

63.     Between approximately 8:15 AM and 8:38 AM, Mr. Alexis moved from the fourth floor to the third floor, where he killed additional people.  He then moved to the first floor where he continued shooting.

64.     At approximately 8:16 AM, the Naval District Washington Region Dispatch Center received a phone call reporting an active shooter on the fourth floor of Building 197.

65.     At approximately 8:20 AM, two Naval Security Force members entered Building 197.  Thereafter, other Naval Security Force members entered the building.

14

66.     At approximately 8:30 AM, nine additional Naval Security Force members reported to Building 197.  Ultimately, seventeen Naval Security Force members entered the building.

67.     At approximately 8:38 AM, Mr. Alexis fired his last fatal shot.

68.     At approximately 9:25 AM, Mr. Alexis was shot and killed.

### COUNT I - NEGLIGENT HIRING, RETENTION, AND SUPERVISION OF ALEXIS BY THE EXPERTS

69.     Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

70.     The Experts, as the employer of Mr. Alexis, had a contractual and common law duty to exercise reasonable care to employ, retain, and supervise its employees so as to prevent them from causing foreseeable harm to others.

71.     At all times relevant herein, Mr. Alexis was not mentally fit and competent to work at the Washington Navy Yard, which has a heightened risk of shootings and gun violence given that it is a military installation, has suffered from violent attacks in the past, and has limited physical security based on the presumed proper screening, selection and supervision by contractors of their subcontractors and employees.  Given the heightened risk of shootings and gun violence at the Washington Navy Yard, Mr. Alexis was not mentally fit and competent to work there because, among other reasons, he had been investigated on several occasions for incidents which arose out of the unlawful and violent use of firearms, and because he had exhibited extreme mental disturbances and potentially violent behavior when assigned to work on a different military installation on August 4-7, 2013, only one month before the events of September 16, 2013.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj, working at the Washington Navy Yard.

72.     The Experts failed to exercise reasonable care in hiring, retaining, and supervising Mr. Alexis in that it knew that he was unfit  and incompetent to work at a military installation, such as the Washington Navy Yard, given his propensity for gun violence and symptoms of apparent mental illness and instability that manifested themselves during the events of August 4-7, 2013.  Following these events, The Experts, through its agents and employees, believed that Mr. Alexis was likely to harm others.

73.     The Experts also failed to exercise reasonable care in supervising Mr. Alexis by allowing and/or requiring him to return to duty just two days after the events of August 4-7, 2013, despite knowing that he was behaving in an erratic and dangerous manner while on the job, and was likely to cause harm to others in and around his workplace.

74.     As a direct and proximate result of the negligence of The Experts in the hiring, retention, and supervision of Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

### COUNT II – FAILURE TO CONTROL ALEXIS AND NEGLIGENT UNDERTAKING BY THE EXPERTS

75.     Ms. Jograj incorporates by reference all other  paragraphs of the Complaint as though fully alleged herein.

76.     By hiring Mr. Alexis, performing a background check on him at the time of his hire, performing an investigation following the events of August 4-7 2013, and revoking and reinstating Mr. Alexis's security clearance and access to military installations following these events, The Experts undertook to control Mr. Alexis, whom The Experts knew was likely to cause harm to others in and around his workplace.

77.     The Experts owed those working in and around the Washington Navy Yard, including Ms. Jograj, a contractual and common law duty to perform these functions with due care and to take reasonable steps to ensure that Mr. Alexis was either mentally stable or did not pose a threat to others in his workplace.

78.     At all times relevant herein, The Experts knew that due to the state of his mental health and propensity for gun violence, Mr. Alexis was dangerous to those working in and around the Washington Navy Yard.  Following the events of August 4-7, 2013, The Experts believed that Mr. Alexis was likely to harm others.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj, working at the Washington Navy Yard.

79.     The Experts breached this duty to Ms. Jograj and other individuals at the Washington Navy Yard by:  failing to conduct an adequate investigation prior to hiring Mr. Alexis; failing to conduct an adequate investigation following the events of August 4-7, 2013; failing to take Mr. Alexis out of duty following the events of August 4-7, 2013; failing to report the adverse information up the chain-of-command and to the Department of Defense Central Adjudication Facility and U.S. Navy Installation commanders; failing to prevent Mr. Alexis from having access to the Washington Navy Yard; and otherwise failing to take reasonable steps to control Mr. Alexis to prevent him from causing harm to third persons.

80.     As a direct and proximate result of The Experts' failure to exercise reasonable care to prevent injuries to persons by Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

17

**COUNT III – NEGLIGENCE OF THE EXPERTS**

81.     Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

82.     The Experts, as the employer of Mr. Alexis and because it knew that he was likely to cause harm to others in and around his workplace after the events of August 4-7, 2013, owed persons working at the Washington Navy Yard, including Ms. Jograj, a contractual and common law duty to exercise reasonable care in supervising and controlling Mr. Alexis, including but not limited to controlling his access to the Washington Navy Yard and his return to employment, so as to prevent him from intentionally harming others and to prevent him from conducting himself so as to create an unreasonable risk of bodily harm to others.

83.     Additionally, The Experts, as the employer of Mr. Alexis and because it knew that he was likely to cause harm to others in and around his workplace after the events of August 4-7, 2013, owed persons working at the Washington Navy Yard, including Ms. Jograj, a duty to warn them of the danger posed by Mr. Alexis.

84.     Ms. Jograj and other invitees at the Washington Navy Yard relied upon HPES, along with The Experts, to take reasonable steps to ensure that their employees and agents were mentally stable and did not pose a threat of danger to them in their workplace.

85.     The Experts provided Mr. Alexis access to Building 197 at the Washington Navy Yard by hiring and retaining him, by requesting that he be issued a temporary building pass and CAC, and by facilitating the issuance of these access credentials.

86.     The Experts breached its duty of care to Ms. Jograj and others working at the Washington Navy Yard to prevent Mr. Alexis from causing bodily harm to others because it failed to warn invitees on the premises of the danger posed by Mr. Alexis, and failed exercise

18

adequate control over Mr. Alexis when it knew that he was dangerous and unfit (because of his symptomatic mental illness which manifested itself in the events of August 4-7, 2013, as well as his previous gun violence incidents) to work at the Washington Navy Yard, particularly given that it is a military installation, has suffered from a violent attack in the past, and had limited physical security based largely on presumed proper vetting by contractors of their subcontractors and employees.

87.     The Experts also knew that Mr. Alexis was not mentally fit and competent to work at the Washington Navy Yard because he was behaving in an erratic and dangerous manner while on the job.  The Experts even believed that Mr. Alexis was likely to harm others following the events of August 4-7, 2013.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj, working at the Washington Navy Yard.

88.     The Experts failed to exercise reasonable care by failing to create, develop, or implement an adequate risk assessment or mitigation plan with respect to employees who posed a risk of workplace violence, failing to adequately conduct a psychological fitness examination or require that an adequate psychological fitness examination be conducted before returning Mr. Alexis to duty after the events of August 4-7, 2013, failing to revoke Mr. Alexis's security clearance, failing to bar Mr. Alexis from access to the Washington Navy Yard, failing to report the adverse information up the chain-of-command and to the Department of Defense Central Adjudication Facility and U.S. Navy Installation commanders, failing to warn invitees at the Washington Navy Yard of the danger posed by Mr. Alexis, and otherwise failing to act reasonably under the circumstances.

89.     As a direct and proximate result of The Experts' failure to exercise reasonable care in controlling Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical

and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

### COUNT IV – NEGLIGENCE OF HPES FOR NEGLIGENT HIRING, RETENTION, & SUPERVISION OF THE EXPERTS

90.     Ms. Jograj incorporates by reference all other  paragraphs of the Complaint as though fully alleged herein.

91.     At all times relevant herein, HPES knew or should have known that Mr. Alexis, an employee of its subcontractor The Experts, was not mentally fit and competent to work at the Washington Navy Yard, which has a heightened risk of shootings and gun violence given the fact that it is a military installation, has suffered from violent attacks in the past, and has limited physical security which is based on presumed proper vetting by contractors of their subcontractors and employees.  Mr. Alexis was not mentally fit and competent to work at the Washington Navy Yard, because among other reasons, he had been investigated on several occasions for incidents which arose out of the unlawful and violent use of guns, and because he had exhibited extreme mental disturbances when assigned to work on a different military installation only one month before the events of September 16, 2013.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj working at the Washington Navy Yard.

92.     At all times relevant herein, HPES, by contracting with The Experts, had a contractual and common law duty to exercise reasonable care to employ, retain, and supervise The Experts, whom it knew or should have known was negligent in performing the contract based on its hiring, retention and daily supervision of Aaron Alexis

93.     HPES failed to exercise reasonable care in employing, retaining, and supervising The Experts because it knew or should have known that The Experts had returned Mr. Alexis to

duty following the events of August 4-7, 2013, despite its knowledge that Mr. Alexis was not mentally fit and competent to work on a military installation given his previous gun violence incidents and the events of August 4-7, 2013.  HPES further failed to exercise reasonable care because it allowed and/or required The Experts to return Mr. Alexis to duty after the events of August 4-7, 2013, and furnished him access to the Washington Navy Yard despite having actual and/or constructive knowledge that Mr. Alexis was behaving in an erratic and dangerous manner while on the job, and despite knowing that Mr. Alexis was likely to cause harm to others in and around his workplace.

94.     As a direct and proximate result of the negligence of HPES in the hiring, retention, and supervision of The Experts, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

### COUNT V – FAILURE TO CONTROL ALEXIS AND NEGLIGENT UNDERTAKING BY HPES

95.     Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

96.     By contracting The Experts to perform services at the Washington Navy Yard, assuming responsibility for Mr. Alexis during the events of August 4-7, 2013, reporting Mr. Alexis's behavior to The Experts, and allowing Mr. Alexis to return to duty just two days following the events of August 4-7, 2013, HPES assumed a contractual and common law duty to others working at the Washington Navy Yard, including Ms. Jograj, to perform these functions with due care and to take reasonable steps to ensure that Mr. Alexis was mentally stable and did not pose a threat to others in the workplace.

97.     At all times relevant herein, HPES, with actual knowledge of the events of August 4-7, 2013, knew or should have known that due to the state of his mental health and his propensity for gun violence, Mr. Alexis was dangerous to those working in and around the Washington Navy Yard.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj, working at the Washington Navy Yard.

98.     HPES breached this duty to Ms. Jograj and other individuals at the Washington Navy Yard by failing to take reasonable steps to ensure that The Experts followed through on its investigation of Mr. Alexis following the incidents of August 4-7, 2013, failing to conduct an adequate investigation itself following the incidents of August 4-7, 2013, failing to report the adverse information up the chain-of-command and to the Department of Defense Central Adjudication Facility and U.S. Navy Installation commanders, failing to keep Mr. Alexis out of duty after the events of August 4-7, 2013, failing to prevent Mr. Alexis from having access to the Washington Navy Yard, and otherwise failing to take reasonable steps to control Mr. Alexis to prevent him from causing harm to third persons.

99.     As a direct and proximate result of HPES's failure to exercise reasonable care in its undertaking of the aforementioned functions of Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

### COUNT VI –NEGLIGENCE AND NEGLIGENT HIRING, RETENTION, & SUPERVISION OF ALEXIS BY HPES

100.    Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

101.    HPES, as a contractor employing The Experts and Mr. Alexis and through the

actions of its supervisors during the events of August 4-7, 2013 where they assumed responsibility over Mr. Alexis, owed both a contractual and common law duty of reasonable care to third persons, including Ms. Jograj, to employ, retain, and supervise its agents and employees, including Mr. Alexis, so as to prevent them from causing foreseeable harm to others.

102.    HPES provided Mr. Alexis access to Building 197 at the Washington Navy Yard by requesting that he be issued a temporary building pass and a CAC, and by facilitating the issuance of these access credentials.

103.    HPES retained control over The Experts and Mr. Alexis as demonstrated by the fact that, among other evidence, HPES supervisors were the lead supervisors of Mr. Alexis at both the Naval Undersea Warfare Center and the Washington Navy Yard, HPES supervisors closely supervised Mr. Alexis's work at both the Naval Undersea Warfare Center and the Washington Navy Yard, Mr. Alexis stayed in a hotel room with an HPES second shift supervisor on the night of August 6-7, 2013, and all employees of The Experts, including Mr. Alexis, were working under the Contract that HPES had secured with the Navy.

104.    Ms. Jograj and other invitees at the Washington Navy Yard relied upon HPES, along with The Experts, to take reasonable steps to ensure that their employees and agents were mentally stable and did not pose a threat of danger to them in their workplace.

105.    HPES failed to exercise reasonable care in hiring, retaining, and supervising Mr. Alexis because it failed to warn invitees at the Washington Navy Yard of the danger posed by Mr. Alexis, failed to take Mr. Alexis out of duty, failed to require that he obtain mental health treatment, and failed to exercise adequate control over Mr. Alexis when it knew or should have known that he was unfit (because of his symptomatic mental illness which manifested itself in the events of August 4-7, 2013, as well as his previous gun violence incidents) to work at the

Washington Navy Yard, particularly given that it is a military installation, has suffered from a violent attack in the past, and had limited physical security based largely on presumed proper vetting by contractors of their subcontractors and employees.

106.    HPES also knew or should have known that Mr. Alexis was not mentally fit and competent to work at the Washington Navy Yard because he was behaving in an erratic and dangerous manner while on the job, and because he was likely to cause harm to others in and around his workplace if not controlled.  Given these facts, it was highly foreseeable that Mr. Alexis would attack persons, including Ms. Jograj, working at the Washington Navy Yard.

107.    HPES failed to exercise reasonable care by failing to create, develop, or implement an adequate risk assessment or mitigation plan with respect to employees who posed a risk of workplace violence, failing to adequately conduct a psychological fitness examination or require that an adequate psychological fitness examination be conducted before returning Mr. Alexis to duty after the events of August 4-7, 2013, failing to revoke Mr. Alexis's security clearance, failing to warn invitees at the Washington Navy Yard of the danger posed by Mr. Alexis, and otherwise failing to act reasonably under the circumstances.

108.    As a direct and proximate result of HPES's failure to exercise reasonable care in controlling Mr. Alexis and failure to exercise reasonable care in the hiring, retention, and supervision of Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

### COUNT VII -  NEGLIGENCE OF THE EXPERTS AND HPES FOR VIOLATIONS OF SAFETY STATUTES, STANDARDS, REGULATIONS, AND GUIDELINES

109.    Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

24

110.     The Experts and HPES had a statutory duty under the District of Columbia Industrial Safety Act[2] (the "ISA"), the Occupational Safety & Health Act, and all other applicable safety statutes, standards, regulations, and guidelines, to furnish a reasonably safe place of employment to all employees on their respective work sites, including Ms. Jograj. These duties include but are not limited to a duty to act with reasonable care to take appropriate measures to prevent workplace violence.

111.     At all times relevant herein, The Experts and HPES exercised control and custody over Mr. Alexis and his place of employment, Building 197, by employing him, temporarily removing him from his employment as a result of the incidents of August 4-7, 2013, subsequently returning him to duty and assigning him to work at the Washington Navy Yard, and permitting him access to the Washington Navy Yard and Building 197.

112.     The Experts and HPES failed to furnish a reasonably safe place of employment to Ms. Jograj by failing to remove Mr. Alexis from duty for a sufficient period of time following the events of August 4-7, 2013, permitting Mr. Alexis to return to duty without submitting any documentation of mental health treatment; and negligently providing Mr. Alexis access to the Washington Navy Yard and Building 197 despite having actual and constructive knowledge that Mr. Alexis was likely to cause bodily injury to persons in or around his workplace.

113.     As a direct and proximate result of The Experts and HPES's failure to exercise reasonable care in controlling Mr. Alexis, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past and future.

---

[2] D.C. Code § 32-801 to -812 (2001).

### COUNT VIII – NEGLIGENCE OF HBC MANAGEMENT AND THE HANA GROUP

114.    Ms. Jograj incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

115.    At all times relevant herein, HBC and/or The Hana Group had a statutory, regulatory, contractual, and common law duty to exercise reasonable care in providing security services to the Washington Navy Yard and Building 197, and as such had a duty to invitees on the premises, including Ms. Jograj, who were working in the building and who relied upon HBC and/or The Hana Group to devise and implement a reasonable security plan with adequate systems in place to protect people working at the Washington Navy Yard and Building 197, perform inspections of persons and their belongings before permitting access to the building, to monitor CCTV devices, to intervene to prevent harm to third persons such as Plaintiff, and otherwise take reasonable steps to ensure the security of the building.

116.    On the date of the incident, HBC and/or The Hana Group breached their duty of reasonable care to Ms. Jograj and other invitees on the premises by failing to maintain an adequate level of security in Building 197, failing to implement procedures including a bag and/or person search of Mr. Alexis and his belongings on September 16, 2013, failing to monitor CCTV devices, failing to intervene once its agents and employees knew a crime was in progress, failing to maintain Building 197 as a gun-free zone as required by law, and otherwise failing to act with reasonable care under the circumstances.

117.    As a direct and proximate result of HBC and/or The Hana Group's failure to exercise reasonable care under the circumstances, Ms. Jograj has suffered and will continue to suffer severe physical and/or psychological injuries; physical, mental, and/or emotional pain and suffering, both past and future; medical treatment, both past and future; and wage loss, both past

and future.

### COUNT IX – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS –ALL DEFENDANTS

118.     Plaintiff incorporates by reference all other paragraphs of the Complaint as though fully alleged herein.

119.     At all times relevant herein, Ms. Jograj was in the zone of danger of the shooting perpetrated by Aaron Alexis as described in the preceding paragraphs as she was present on the fourth floor of Building 197 during the shooting and had a reasonable basis to fear for her safety during the shooting.

120.     Defendants negligently caused Ms. Jograj to be placed in danger during the shooting of September 16, 2013, as described in the preceding counts.

121.     As a direct and proximate cause of the Defendants' negligence, Ms. Jograj has suffered and will continue to suffer from severe emotional distress and the sequelae of that emotional distress.  She has incurred medical expenses, both past and future, and has suffered wage loss, both past and future, as well as pain and suffering, both past and future.

122.     Ms. Jograj's emotional distress is serious and verifiable, and has required treatment in the form of psychological and/or psychiatric care.


WHEREFORE, in consideration of the above counts, Plaintiff demands judgment against Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest, costs, and any other relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims and issues so triable.

Respectfully submitted,

KOONZ, MCKENNEY, JOHNSON,
 DEPAOLIS & LIGHTFOOT, L.L.P.


By:      /s/ David M. Schloss
         David M. Schloss        #416523
         Kasey K. Murray         #1016186
         2001 Pennsylvania Avenue, N.W.
         Suite 450
         Washington, D.C.  20006
         (202) 659-5500
         dschloss@koonz.com
         kmurray@koonz.com
         *Counsel for Plaintiff*

Respectfully submitted,

BLANKINGSHIP & KEITH, P.C.

By:      /s/ Peter S. Everett
         Peter S. Everett        #290270
         Mark A. Towery          #416722
         4020 University Drive
         Suite 300
         Fairfax, VA  22030
         (703) 691-1235
         mtowery@bklawva.com
         *Counsel for Plaintiff*